# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

---

RHAEQHUAN MONT,

                              Plaintiff,

      v.                                        9:22-CV-215
                                                    (DNH/ATB)

M. WELLS, et al.,

                              Defendants.

---

RHAEQHUAN MONT, Plaintiff, pro se
ANTHONY HUNTLEY, Asst. Att'y General, for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

Presently before the court is the defendants' motion for summary judgment, pursuant to Fed. R. Civ. P. 56. (Dkt. No. 15). This matter has been referred to me for Report and Recommendation by United States District Judge David N. Hurd, pursuant to 28 U.S.C. § 636(b) and Local Rule N.D.N.Y. 72.3(c). For the reasons set forth below, this court recommends granting defendants' motion in part and denying it in part. Specifically, the court recommends that one of the claims against defendant Cook should survive defendants' motion for summary judgment. However, in the alternative, I recommend that the district court dismiss, sua sponte, plaintiff's complaint in its entirety for failure to prosecute and/or failure to comply with the court's orders and Local Rules unless plaintiff, in objections to this recommendation, provides adequate justification for his prolonged failure to provide current and accurate contact information to the court.

1

I.    **Background**

A.    **Procedural History**

In this civil rights action, plaintiff alleges that various constitutional violations occurred while he was incarcerated at Clinton Correctional Facility ("C.F."), in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Plaintiff filed the original complaint on March 7, 2022. (Dkt. No. 1). On April 4, 2022, Judge Hurd determined, pursuant to his initial review of the complaint, that only plaintiff's Eighth Amendment excessive force claims as asserted against defendant corrections officer ("C.O.") Cook and defendant C.O. Wells could proceed. (Dkt. No. 5). In his decision, Judge Hurd advised plaintiff of his duty to keep the court and parties updated with any changes in his address. (*Id.* at 29). Judge Hurd also specifically warned plaintiff that his failure to do so may result in the dismissal of his action. (*Id.*).

Defendants responded to the complaint via the filing of an answer, and discovery ensued. (Dkt. Nos. 11, 12, 13). On February 6, 2023, defendants filed the instant motion for summary judgment. (Dkt. No. 15). Defense counsel served the motion, along with a notice of the consequences of failing to respond to the motion, on plaintiff at his address of record. (*Id.*). On February 7, 2023, the Clerk sent a notice to plaintiff regarding the February 27th deadline to respond to defendants' motion for summary judgment, which also explained the consequences of not responding to the motion. (Dkt. No. 16). The court's notice was served on plaintiff, by mail, at both Attica C.F. and Clinton C.F. (*Id.*). Both notices were returned as "undeliverable" by the respective

2

correctional facilities, with indications that plaintiff has been released from their custody. (Dkt. Nos. 18, 19). The court's review of the DOCCS inmate locator confirms that plaintiff was released to the division of parole from Attica C.F. as of December 29, 2022.[1] To date, plaintiff has not updated his contact information, responded to the defendants' motion, or requested an extension of time to respond.

### B.     Facts and Contentions

Plaintiff was an inmate in the custody of Clinton C.F. at all times relevant to the instant action. The following is a summary of the relevant facts as stated in the complaint. To the extent that additional facts were developed through discovery, and included in the summary judgment motion, I will discuss them during my analysis of the pending claims.

Plaintiff alleges that beginning in or around early November 2021, he "began to 'clash' and have 'verbal fights'" with defendant C.O. Cook, who was assigned to work in the housing area where plaintiff's cell was located at Clinton C.F. (Compl. at 3). These verbal exchanges allegedly occurred as a result of C.O. Cook "'purposely' not marking plaintiff down for chow (messhall), recreation yard, and/or kiosk," despite plaintiff's requests. (*Id.*).

On December 1, 2021, C.O. Cook was responsible for preparing the morning "chow" list for the housing area where plaintiff's cell was located, and operating the "control board" for opening cells. (*Id.*). Although plaintiff requested to be "marked down" for chow, C.O. Cook did not add plaintiff's name to the list, and did not open his

---

[1] *See* https://nysdoccslookup.doccs.ny.gov/

cell. (*Id.*).  After the other inmates in plaintiff's housing area were released from their cells for breakfast, C.O. Cook "did a 'round' on the tier to ensure that all cells were properly closed and all inmates who did not attend chow[] were 'alive and well' inside of their assigned cells." (*Id.*).  When C.O. Cook neared plaintiff's cell, plaintiff "requested to 'see a sergeant[.]'" (*Id.*).  C.O. Cook "chuckled" at plaintiff's request, and plaintiff responded by asking why C.O. Cook "had to be an asshole all of the time?" (*Id.*).  C.O. Cook responded, "I will show you asshole. You haven't seen shit yet." (*Id.*).  Plaintiff asked C.O. Cook whether his statement was a threat, and C.O. Cook advised that he "wouldn't even touch [plaintiff]" because of his light frame, and would instead "'have one of [plaintiff's] own take care of' him." (*Id.*).  Plaintiff did not respond further, but "began to feel worried, anxious, paranoid and curious as to what [C.O. Cook] was insinuating[.]" (*Id.*).  Plaintiff remained in his cell for the remainder of the day.  (*Id.*).

On December 4, 2021, an inmate known to plaintiff as "Lefty" advised plaintiff that he overheard other inmates talk about stabbing plaintiff "for violating Cook[,]" and that C.O. Cook "paid someone 8 bricks (Newports)" to carry out the attack.  (Compl. at 3).  Lefty encouraged plaintiff to "give the yard a break for a while[.]" (*Id.*).  Plaintiff, in fear for his safety, avoided recreation that day, and as a result, missed an opportunity to speak with his mother and daughter.  (*Id.*).

On December 5, 2021, C.O. Seymour[2] prepared the morning "chow list" for plaintiff's housing area.  (Compl. at 3).  Plaintiff was placed on the list, and was thereafter released from his cell for breakfast in the mess hall.  (*Id.*).  After arriving in the mess hall, plaintiff "grabbed food and sat down" in front of Lefty, who advised plaintiff to "watch his back."  (*Id.*).  Less than one minute later, inmates from "8 company" entered the messhall, and one of those inmates approached and attacked plaintiff while he was seated.  (*Id.* at 3-4).  "[R]esponding officers" arrived at the scene, and plaintiff was "sprayed with OC" and "taken to medical[,] where he was decontaminated and checked for injuries."  (*Id.* at 4).  Thereafter, plaintiff was returned to his cell, issued a "disciplinary ticket," and placed on keeplock status pending a disciplinary hearing.  (*Id.*).

On December 12, 2021, plaintiff was escorted to "8 company" to make a phone call.  (Compl. at 4).  While using the phone, plaintiff observed C.O. Cook "conversing with the 'A-man' of the unit."  (*Id.*).  C.O. Cook briefly made eye contact with plaintiff and "smiled and winked" at him.  (*Id.*).  Plaintiff interpreted this as C.O. Cook's indication that he had "made good on his word" and was responsible for the mess hall attack.  (*Id.*).

On December 17, 2021, plaintiff was issued a "COVID test[.]"  (Compl. at 4).  Three days later, plaintiff and several other inmates from "Upper H, 10 company" were informed that they "would be 'quarantined' and 'moving to another housing unit.'"

---

[2] Although the complaint names C.O. Seymour as a defendant, this action was dismissed as against him on April 4, 2022, pursuant to Judge Hurd's order on initial review.  (Dkt. No. 5).

(*Id.*).  At approximately 10:20 a.m., defendant C.O. Wells opened the cells for the inmates moving to D-block, including plaintiff.  (*Id.*).  At some point after the cells were opened, C.O. Seymour and C.O. Wells "both briefly abandoned their posts[,]" which allowed the inmates to "wander freely" from 10 company to 8 company, where they were supposed to bring their property bags.  (*Id.*).  As plaintiff walked "down the tier" and approached the stairs, an inmate porter "swung on plaintiff[,] striking him in the back of the head."  (*Id.*).  Plaintiff initially believed the strike was a mistake because he had no prior issues with this inmate, and therefore "continued down the tier[,] at which time [the inmate porter] . . . attempted to punch plaintiff again[.]"  (*Id.*at 5).

As plaintiff and the inmate porter "tussled[,]" C.O. Wells, "hearing the commotion, ran to the company . . . and yelled for the inmates to "break it up."  (Compl. at 5).  Plaintiff alleges that he complied with the directive and released the inmate porter, but C.O. Wells "used his OC spray" and "spray[ed] only plaintiff in both of his eyes twice[,]" as the inmate porter "stepped back and laid on the floor."  (*Id.*).  Plaintiff was then "handcuffed and escorted to medical, where he was decontaminated" and evaluated for injuries.  (*Id.*).

On December 31, 2021, C.O. Seymour "shut off" the power to plaintiff's cell, which remained off until his disciplinary hearing on or about January 6, 2022.  (Compl. at 5).  At some point, plaintiff asked C.O. Seymour about the power to his cell.  (*Id.*).  In response, C.O. Seymour "smirked and replied, 'Cook says hi[.]'"  (*Id.*).

## II.    **Summary Judgment**

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial.  *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant.  *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.  "Only disputes over ['material'] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

While courts are required to give due deference to a plaintiff's pro se status, that status "does not relieve plaintiff of his duty to meet the requirements necessary to defeat

a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). Generally, failure to respond to a motion for summary judgment results in summary judgment for the moving party, "once the court assures itself that Rule 56's other requirements have been met." *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009)); *see also* N.D.N.Y. Local Rule 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers . . . shall be deemed as consent to the granting or denial of the motion[.]").

Notwithstanding the aforementioned, the Second Circuit has clarified that "[a] non-response does not risk a default judgment." *Jackson v. Federal Exp.*, 766 F.3d 189, 194 (2d Cir. 2014). "Before summary judgment may be entered, the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed." *Id.* (citing *Vermont Teddy Bear Co. v. 1–800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004)). In doing so, the court may rely on other evidence in the record even if uncited. Fed. R. Civ. P. 56(c)(3). "And, of course, the court must determine whether the legal theory of the motion is sound. Thus, Rule 56 does not allow district courts to automatically grant summary judgment on a claim simply because the summary judgment motion, or relevant part, is unopposed." *Jackson*, 766 F.3d at 194.

### III.    Exhaustion of Administrative Remedies

### A.    Legal Standards

The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. §1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action.  The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim.  *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004), (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002)), abrogated on other grounds by *Ross v. Blake*, 578 U.S. 632 (2016).  Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

In order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules.  *Jones v. Bock*, 549 U.S. 199, 218-19 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)).  In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court.  *Woodford,* 548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process.  The inmate must first file a grievance with the Incarcerated[3] Grievance Resolution Committee ("IGRC").

---

[3] This committee was formerly known as the "Inmate Grievance Resolution Committee," but has recently been renamed.

N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b).  An adverse decision of the IGRC may be appealed to the Superintendent of the Facility.  *Id*. § 701.5(c).  Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC").  *Id*. § 701.5(d).  The court also notes that the regulations governing the Incarcerated[4] Grievance Program ("IGP") encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance."  *Id*. § 701.3(a) (Inmate's Responsibility).  There is also a special section for complaints of harassment.  *Id*. § 701.8.  Complaints of harassment are handled by an expedited procedure which provides that such grievances are forwarded directly to the Superintendent of the facility, after which the inmate must appeal any negative determination to the CORC.  *Id.* §§ 701.8(h) & (I), 701.5.

Prior to *Ross v. Blake, supra*, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies.  *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004).  The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement.  *Id.*

---

[4] The program was formerly known as the "Inmate Grievance Program," but has recently been renamed.

In *Ross*, the Supreme Court made it clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, 578 U.S. 632, 640 (2016). "[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion." *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. 2016) (quoting *Ross*, 578 U.S. at 639). Although *Ross* has eliminated the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, 578 U.S. at 642. Courts evaluating whether an inmate has exhausted his or her administrative remedies must consider whether those remedies were "available" to the inmate. *Id.*; *see also Riles*, 2016 WL 4572321 at *2.

An administrative procedure is "unavailable" when (1) "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) it is "so opaque that is [sic] becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 578 U.S. at 643-44. In *Ross*, the Supreme Court gave examples of the circumstances under which each of the above would apply. *Id*. The first circumstance listed above involves a case in which the relevant "administrative procedure" lacks the authority to provide "any" relief. *Id*. at 643. The second example is when the administrative procedure "exists," but is so complicated or "opaque" that no ordinary prisoner could "discern or navigate it." *Id*. at 643-44. Finally, administrative remedies are not

11

available if prison administrators prevent inmates from taking advantage of the grievance process by misleading or threatening them, preventing their use of the administrative procedure. *Id*. at 644.

In *Williams v. Priatno*, 829 F.3d 118, 123-27 (2d Cir. 2016), the Second Circuit considered whether administrative remedies had been "actually available" to an inmate housed in the Special Housing Unit ("SHU"), in the context of grievances allegedly submitted to facility staff, but purportedly never filed with the IGRC. There, the plaintiff alleged that while housed in the SHU, he drafted a grievance that he delivered to a correctional officer to forward to the grievance office on his behalf. *Id*. at 120-21. Approximately two weeks later, the plaintiff was transferred to a different facility. *Id*. at 121. He never received a response to his grievance and alleged that it was never filed by the officer to whom he had given it. It was undisputed the plaintiff never appealed the grievance. *Id*. The defendants in *Williams* argued that even if the grievance was never filed, the plaintiff was required to appeal it and complete the grievance process. *Id*. at 124. The Second Circuit rejected this argument and held that, for an inmate in the plaintiff's situation, the regulatory scheme was so "opaque" and "confusing" as to be practically unavailable. *Id.* The Second Circuit found that DOCCS regulations "only contemplate appeals of grievances that [have been] actually filed . . . [and] give no guidance whatsoever to an inmate whose grievance was never filed." *Id.* "Following the Second Circuits decision in *Williams*, several courts have concluded that where a grievance is both *unfiled* and *unanswered*, the process to appeal . . . is prohibitively opaque, such that no inmate could actually make use of it." *Maldonado v.*

*Mandalaywala*, No. 9:17-CV-1303 (BKS/TWD), 2020 WL 1159426, at *15 (N.D.N.Y.

Feb. 12, 2020), *report and recommendation adopted*, 2020 WL 1157643 (N.D.N.Y.

Mar. 10, 2020) (internal quotation marks omitted) (listing cases).

## B.    Analysis

Defendants argue that the complaint should be dismissed because plaintiff failed

to exhaust administrative remedies with respect to his excessive force claims against

C.O. Cook and C.O. Wells.  Specifically, defendants maintain that it is "undisputed"

that plaintiff did not grieve the incidents that form the bases for his allegations in the

complaint.  (Def.'s MOL at 11).  In support of their motion, defendants have submitted

the sworn declarations of Clinton C.F. IGP supervisor Christine Gregory, and DOCCS

IGP director Rachael Seguin, establishing that DOCCS has no record of plaintiff filing a

grievance at any time during his incarceration at Clinton C.F.  (Declaration of Christine

Gregory, Dkt. No. 15-6; Declaration of Rachael Seguin, Dkt. No. 15-7).  Defendants

further represent that plaintiff has "admitted that he did not file 'a single grievance,'"

citing to plaintiff's deposition testimony.  (*Id.*).

As previously discussed, plaintiff did not respond in opposition to the defendants'

motion.  However, in his complaint plaintiff alleged that, while confined in the SHU, he

"submitted grievances on January 10, 2022, and January 18, 2022" regarding the

December 5, 2021, and December 20, 2021 events giving rise to his claims.  (Compl. at

5-6).  Plaintiff further alleged that he "never received any response or confirmation that

the[se] grievances were ever even received by I.G.R.C [sic] to whom plaintiff addressed

the grievances[.]"  (*Id.*).  "Growing impatient," plaintiff "wrote . . . letter[s]" to the

13

Commission of Correction in Albany, New York in January and February 2022, "informing them that his 'grievances were being ignored' and he 'would like to exhaust his administrative remedies.'" (*Id.*). Plaintiff also alleged that he wrote an "'in house' letter to [the] Superintendent . . . informing her of the same issues[.]" (*Id.*). Plaintiff received responses from the offices of the Commissioner and the Superintendent, stating that plaintiff "followed the proper procedures and 'should await a response from I.G.R.C.'" (*Id.*). Copies of these correspondences are attached as exhibits to the defendants' motion. (Attorney Declaration of Anthony Huntley ("Huntley Dec.") Exs. I, J, K). Plaintiff also alleged in his complaint that Clinton C.F.'s failure to maintain a "mail log" makes it "extremely difficult" for him to prove that he has followed the proper procedures of exhausting his administrative remedies. (*Id.*). Based on these representations, plaintiff requested that this court "excuse the exhaustion requirement in this case, with respect to the 45[-]day time limit that plaintiff has to even file a grievance regarding his complaints." (*Id.*).

Plaintiff's deposition testimony regarding his efforts to exhaust his administrative remedies is of further relevance to this court's analysis of defendants' motion. At his deposition, plaintiff testified that the grievance process at Clinton C.F. was a "lose-lose" situation, and acknowledged their failure to record any of the grievances that he had filed since his transfer to the facility:

> I wrote O.S.I. because I was trying to grieve something else. I forgot what it was specifically and I wrote them. And they wrote me back and said they contacted the superintendent. *And on record, I had no grievances in. I've never filed a single grievance.* So that right there just showed me like it's – it's a lose-lose. Was -- how am I going to put a grievance is [sic] if -- I

14

> mean, like, let's be real about it.  If I ran a facility and somebody was grieving something that could potentially caused my facility, you know, to be looked at with scrutiny or -- or get one of my officers fired and get sued, why would I put that grievance in.  I'm going to throw that in the garbage. I'm going to say that person never did a grievance. I mean, there's no mail log, how is he going to prove it?

(Attorney Declaration of Anthony Huntley ("Huntley Dec.") Ex. M ("Pl.'s Dep.") at 47) (Dkt. No. 15-3) (emphasis added).  Clearly, plaintiff's testimony was not an admission that he did not attempt to file any grievances, but that the facility had no record of the grievances he purportedly tried to file.  In fact, when asked if he grieved the underlying incidents taking place on December 5th and 20th, plaintiff responded, "I definitely did . . . I definitely did it."  (*Id.*).

When plaintiff was asked during the deposition when he filed a grievance concerning the December 5, 2021 incident in the mess hall, he testified that "two days after [he] got to the box, [he] just . . . started doing everything.  [He] started writing grievances, got . . . a few notebooks . . . ."  (Pl's Dep. at 48).  Plaintiff testified that he "thought" that he entered SHU on or about January 5, 2022.  (*Id.* at 48).  However, the transcript of plaintiff's Tier III disciplinary hearing, which took place on January 6, 2022, was submitted as an exhibit by the defendants as an exhibit to their motion. (Huntley Dec. Ex. L at 11-12).  According to the transcript, plaintiff was confined to the SHU on or about December 20, 2021, presumably immediately after the second assault alleged in plaintiff's complaint.[5]  (*See also* Compl. at 5).  Plaintiff was not asked at his

---

[5] At the Tier III disciplinary hearing held on January 6th, hearing officer Frenya read the guilty disposition into the record.  (Huntley Decl. Ex. L at 11-12).  At that time, hearing officer Frenya indicated that plaintiff had already served 17 days in the SHU prior to his hearing.  (*Id.* at 11).

deposition, nor did he testify about the specific date on which he purportedly filed a grievance concerning the December 20, 2021 incident giving rise to the complaint.

The relevant DOCCS regulation here, N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5 states:

> *Time limit for filing*. An inmate must submit a complaint to the clerk within 21 calendar days of an alleged occurrence on an inmate grievance complaint form (form #2131). If this form is not readily available, a complaint may be submitted on plain paper. The complaint may only be filed at the facility where the inmate is housed even if it pertains to another facility.

The regulations specify that grievances submitted from inmates confined to the SHU are subject to the same 21-day time limit. 7 NYCRR § 701.7(e). Pursuant to these regulations, plaintiff's deadline to file a grievance with respect to the events taking place on December 5, 2021 would have expired by December 26, 2021.[6] Accordingly, the dates on which plaintiff alleged to have filed grievances in his complaint, January 10th and January 18th, at the very least appear to be outside the deadline for the December 5, 2021 events giving rise to the complaint, if not also the December 20, 2021 events. However, plaintiff's later testimony as submitted by the defendants with their motion suggests that he filed the purported grievances within days of arriving to

---

[6] To the extent plaintiff's grievance alleged harassment by a DOCCS employee, it would have been subject to the "expedited procedure" set forth in 7 NYCRR § 701.8. According to this section, inmates who wish to file a grievance complaint that alleges employee harassment are subject to the same 21-day time limit for filing. *See* 7 NYCRR § 701.8(a).

the SHU, which would have been prior to the expiration of his filing deadline. Further complicating this issue is the fact that plaintiff appears be under the impression that his deadline to file a grievance through the IGP was 45 days.[7] (*See* Compl. at 6).

Accordingly, this court appears to be presented with a myriad of unresolved factual issues concerning plaintiff's exhaustion of his administrative remedies, including (1) whether plaintiff actually filed grievances with respect to the December 5th and December 20th events giving rise to his surviving causes of action, (2) whether plaintiff timely filed said grievances, and (3) whether the administrative procedures were "unavailable" to plaintiff at Clinton C.F., pursuant to *Ross* and *Williams v. Priatno*.[8] "When questions of fact and issues of credibility exist regarding the failure to

---

[7] Pursuant to 7 NYCRR § 701.6(g), an exception to the 21-day time limit *may* be granted based on mitigating circumstances, but an exception "may not be granted more than 45 days after an alleged occurrence." Plaintiff does not claim that he requested an exception to the time limit in this case, nor does he suggest that any exception was granted. "[F]iling an untimely grievance without subsequently obtaining a finding of mitigating circumstances is insufficient to exhaust one's available administrative remedies." *Harris v. Buskey*, No. 9:21-CV-470 (LEK/CFH), 2022 WL 2663421, at *1 (N.D.N.Y. July 11, 2022) (quoting *Adams v. Ohara*, No. 16-CV-0527 (GTS/ATB), 2019 WL 652409, at *7 (N.D.N.Y. Feb. 15, 2019)).

[8] Some district courts have granted summary judgment on exhaustion grounds notwithstanding *Williams*, under circumstances where the plaintiff provided no specifics or corroboration related to a grievance purportedly filed during his confinement in the SHU. *See, e.g., Sankara v. Montgomery,* No. 9:16-CV-00885 (FJS/TWD), 2018 WL 4610686, at *8 (N.D.N.Y. June 25, 2018), *report and recommendation adopted*, 2018 WL 3408135 (N.D.N.Y. July 13, 2018) ("Plaintiff's conclusory allegations that the DOCCS IGP was unavailable to him [while confined to the SHU] were insufficient to withstand summary judgment," where the plaintiff "provided no evidence that he actually did write grievances; when they were written; the content of the grievances . . . the officers named in the grievance(s) . . .; the specific steps taken by Plaintiff to provide them to an officer to send to the grievance office; and any specific follow up with the grievance office[.]" ). In this case, however, plaintiff has made specific factual allegations regarding his efforts to file a grievance from the SHU, albeit with some conflicting statements

exhaust administrative remedies, a court should neither engage in fact finding nor make determinations as to credibility in addressing a defendant's motion for summary judgment for failure to exhaust." *Curtis v. Bola*, No. 9:15-CV-718 (GLS/TWD), 2016 WL 7735755, at *9 (N.D.N.Y. Nov. 1, 2016), *report and recommendation adopted*, 2017 WL 120945 (N.D.N.Y. Jan. 12, 2017) (listing cases).  Thus, under different circumstances the court would likely have recommended that an evidentiary hearing be ordered by the district court, in which the exhaustion issue could be determined as a matter of law.  However, as further discussed below the court recommends that some of plaintiff's claims be dismissed on the merits, notwithstanding the exhaustion issue; therefore an evidentiary hearing would not be warranted with respect to those claims.

Moreover, plaintiff's continuing failure to advise the court of his contact information after his release from prison in December 2022, reflecting his possible abandonment of this action, creates an indefinite impediment to the court's ability to schedule and conduct an exhaustion hearing.  Accordingly, as further discussed below, the court alternatively recommends that plaintiff's complaint be dismissed in its entirety

---

regarding when they were submitted, and he documented efforts to follow up when he received no response.  Under these circumstances, plaintiff's allegations would seem sufficient to create a material issue of fact regarding the availability of the grievance process to him.  *See, e.g.*, *Tillman v. Phillips*, No. 9:19-CV-1597 (LEK/CFH), 2021 WL 5233308, at *7, 9 (N.D.N.Y. Nov. 10, 2021), *report and recommendation adopted*, 2021 WL 5768393 (N.D.N.Y. Dec. 6, 2021) (distinguishing *Sankara*, and denying summary judgment on exhaustion issue where plaintiff provided specifics related to grievance purportedly filed in SHU and documented efforts to follow up when he received no response; although there were some inconsistencies in plaintiff's allegations regarding whether he submitted his grievance by the relevant deadline, the court determined it would be inappropriate to weigh in on the factual dispute or make credibility determinations in the context of a summary judgment motion).

for failure to obey the court's orders and directives, unless plaintiff promptly advises the court of accurate contact information, adequately explains his delay in doing so, and demonstrates his intention to continue to prosecute this action.

## IV.   **Excessive Force**

### A.   **Legal Standard**

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992).  To sustain a claim of excessive force, a plaintiff must establish both the objective and subjective elements of an Eighth Amendment claim.  *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999); *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993).

In order to satisfy the objective element of the constitutional standard for excessive force, a defendant's conduct must be "inconsistent with the contemporary standards of decency."  *Whitely v. Albers*, 475 U.S. 312, 327 (1986) (citation omitted); *Hudson*, 503 U.S. at 9.  "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights."  *Sims v. Artuz*, 230 F.3d 14, 22 (2d Cir. 2000) (citation omitted).  However, the law is clear that "a claim of excessive force may be established even if the victim does not suffer 'serious' . . . or 'significant' injury, . . . provided that the amount of force used is more than '*de minimis*,' or involves force that is 'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S. at 7-10.

19

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id*. at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id*. (quoting *Hudson*, 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response. *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003).

### B.    Analysis

#### 1.  C.O. Wells

Plaintiff alleges that C.O. Wells subjected plaintiff to excessive force on December 20, 2021, when he sprayed plaintiff with pepper spray while plaintiff was engaged in a physical altercation with another inmate. It is undisputed that plaintiff was involved in the physical altercation with another inmate. (*See* Compl. at 4-5; Def.'s SOMF ¶¶ 20-33, Dkt. No. 15-4). It is further undisputed that when C.O. Wells arrived at the scene of the altercation, he gave both individuals direct orders to stop fighting and get on the ground. (*Id*.). C.O. Wells avers that neither plaintiff nor the other inmate complied with his direct orders, therefore he "activated a Level 2 PAS alert and used one application of state issued Oleoresin Capsicum spray ("O.C.") . . . ." (Def.'s SOMF

¶ 24).  C.O. Wells further asserts that the O.C. spray "had the desired effect and both individuals became compliant."  (*Id.* ¶ 25).  Additional staff arrived and gained control of both individuals, who were escorted to medical to be evaluated.  (*Id.* ¶¶ 26-27).  C.O. Wells was not involved in escorting the plaintiff, nor did he use any other force to gain compliance.  (*Id.* ¶¶ 29, 31-32).

Plaintiff's claim that he and the other incarcerated inmate both immediately complied with C.O. Wells' direct order to stop fighting, thereby extinguishing the need for the use of O.C. spray on plaintiff, is belied by video footage of the incident submitted by defendants in support of their motion for summary judgment.  (*See* Huntley Decl. Ex. N).  Specifically, the video evidence shows a corrections officer, presumably C.O. Wells, directing plaintiff and the inmate to "break it up."  (*Id.*).  Nevertheless, the video depicts that the inmates did not immediately comply with the corrections officer's direct order, but continued to "bear hug" each other for some additional period of time before separating themselves and lying on the ground.  (*Id.*).

To be sure, "[t]he use of pepper spray 'constitutes a significant degree of force' and can in certain cases form the basis of a constitutional violation." *Quinones v. Rollison*, No. 18-CV-1170, 2020 WL 6420181, at *4 (S.D.N.Y. Nov. 1, 2020) (quoting *Tracy v. Freshwater*, 623 F.3d 90, 98 (2d Cir. 2010)).  However, in this case, where the application of pepper spray was not gratuitous, but proportional to the need for force in order to break up a physical altercation between two inmates, was limited to one application, and where plaintiff was immediately escorted to medical for an evaluation after the fact, the court agrees that summary judgment is appropriate and recommends

dismissal of this claim. *See Campbell v. Hanson*, No. 17-CV-1024, 2019 WL 2717691, at *4 (S.D.N.Y. June 28, 2019) (holding, on motion for summary judgment, that the plaintiff failed to state an excessive force claim based on use of pepper spray where there was no dispute that the prison official used the "spray in an effort to break up the altercation," where the plaintiff acknowledged "that he heard [the official] issue a verbal warning," and where there was no "evidence indicating that the [pepper] spray was deployed in an effort to cause harm rather than in a good faith effort to maintain and restore discipline" (citation and quotation marks omitted)); *Quinones v. Rollison*, 2020 WL 6420181, at *4-5 (finding that the officer defendant was entitled to summary judgment because the plaintiff had "not established a material issue of fact as to the objective element of his excessive-force claim" where the officer defendant used a chemical agent against two inmates who were in the midst of a violent fight).

### 2.  C.O. Cook

Liberally construed, plaintiff's surviving Eighth Amendment excessive force claims against C.O. Cook include (1) C.O. Cook's application of force on plaintiff during plaintiff's December 5, 2021 altercation with another inmate, and (2) C.O. Cook's alleged orchestration of the December 5th and December 20th assaults on plaintiff by other inmates.

With respect to C.O. Cook's application of force on December 5, 2021, the court agrees that plaintiff has failed to raise a genuine issue of material fact sufficient to overcome summary judgment on this Eighth Amendment claim.  It is undisputed that plaintiff was involved in a physical altercation with another inmate at approximately

7:30 a.m. that morning in the Clinton C.F. mess hall, at which time the two inmates exchanged "closed fist punches to the head and torso of each other." (Def.'s SOMF ¶ 8). According to the defendants, C.O. Cook and two other non-party corrections officers proceeded to give "several direct orders [for plaintiff and the other inmate] to stop fighting and get on the ground[,] but neither complied." (*Id.* ¶ 9). At that time, "a Level 2 PAS alert was activated," and non-party C.O. Hoffer "used one application of state issued [O.C.] spray, as authorized by DOCCS Directive 4944." (*Id.* ¶ 11). "The [O.C.] spray did not have the desired effect and Plaintiff continued to throw closed fist punches at the other incarcerated individual." (*Id*). At that time, non-party C.O. Cipriano used a second application of O.C. spray, "which again did not have the desired effect of quelling the disturbance." (*Id.*). After the second application of O.C. spray, plaintiff "used a body hold to slam the other incarcerated individual to the floor head first, hitting the other incarcerated individual[']s head off of a mess hall table." (*Id.* ¶ 12). C.O. Cook determined that "[f]orce became necessary at this time." (*Id.*). Accordingly, "C.O. Cook used a figure four leg lock body hold to force compliance from the Plaintiff, which eventually ended all force." (*Id.*). Both inmates were thereafter escorted to medical to be evaluated, and C.O. Cook's involvement in the use of force ended. (*Id.*¶¶13-14). C.O. Cook was not involved in escorting the plaintiff away from the incident. (*Id.* ¶ 15).

Plaintiff's rendition of the facts does not materially alter those submitted by the defendants. At his deposition, plaintiff testified that after he "slammed" the other inmate during their altercation, the corrections officers at the scene broke up the fight.

(Pl.'s Dep. at 15).  Plaintiff's primary complaint appears to be that the corrections officers "only sprayed" him with the pepper spray, and not the other inmate; he also maintained that the corrections officers "sprayed [him] for nothing." (*Id.*).  Plaintiff testified that after he was sprayed with pepper spray, he "walked away" and "they slammed [plaintiff] on the floor, got on top [of him], and [told him] to put [his] hands behind [his] back." (*Id.*).  Plaintiff could not identify which corrections officer "broke up the fight," and admitted that it "could have been anybody." (*Id.* at 16).

On this record, a reasonable jury could only conclude that C.O. Cook used only as much force as was necessary to prevent further harm to another inmate or other corrections officers.  With respect to the objective component of plaintiff's excessive force claim, plaintiff has failed to provide evidence of an act in violation of contemporary standards of decency.  *See Conklin v. Hale*, 680 F. App'x 120, 123 (3d Cir. 2017) (upholding district court's determination that no Eighth Amendment violation occurred where the "evidence support[ed] the District Court's finding that [defendant] applied force in a good faith manner to subdue [plaintiff], not maliciously to hurt him," when the defendant put plaintiff in a headlock and "administered two fist jabs"); *Ellis v. Catalano*, No. 16-CV-8452, 2020 WL 1956963, at *10 (S.D.N.Y. Apr. 23, 2020) (dismissing excessive force claims where "undisputed evidence establishe[d] that [corrections officers] used limited force to gain control of a physically violent inmate"); *Mason v. Rich*, No. 3:10-CV-397, 2011 WL 4345025, at *3 (D. Conn. Sept. 15, 2011) (dismissing a claim of excessive force where corrections officer tackled inmate in the recreation yard who "refused to comply with orders to stop fighting"

24

because the corrections officer's "use of force was reasonable in light of the continued fighting and danger to the other inmate"). Plaintiff's unsupported assertion that he "walked away" from the altercation after being sprayed a second time with pepper spray is belied by the contemporaneous reports prepared by various non-party DOCCS employees, each stating that plaintiff failed to comply with the corrections officers' commands. (Huntley Decl. Exs. A, C, E).

Plaintiff's claim also fails on the subjective prong. There is no record evidence to support the notion that C.O. Cook failed to act "in a good-faith effort to maintain or restore discipline," and instead acted "maliciously and sadistically to cause harm." *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003). Plaintiff was given multiple commands to stop fighting, with which he admittedly failed to comply, but instead slammed the other inmate to the floor head-first. It was only at this time that C.O. Cook intervened with a body hold to secure compliance from plaintiff. There is no allegation that C.O. Cook, or any other officer, punched or kicked plaintiff once he was on the ground, or applied other gratuitous force. The record reflects that plaintiff was examined by medical immediately after the altercation and use of force, at which time it was noted he had a "small abrasion behind his right knee." (Huntley Decl. Ex. E). On these facts, plaintiff has failed to set forth evidence that C.O. Cook "sought to wantonly inflict pain" when he used limited force in response to plaintiff's escalation of violence against the other inmate. See *Beauvoir v. Falco,* 345 F. Supp. 3d 350, 363 (S.D.N.Y. Nov. 5, 2018) (explaining that "to determine whether [the] [d]efendants acted maliciously or wantonly," courts must examine, inter alia, "the threat" posed by the plaintiff).

25

Accordingly, plaintiff's excessive force claim stemming from C.O. Cook's specific application of force, i.e., the use of a figure four leg lock body hold, on December 5, 2021, should be dismissed.

Plaintiff also maintains that C.O. Cook was responsible for orchestrating the December 5th and December 20th "assaults" on plaintiff by other inmates, which the district court also interpreted as an Eighth Amendment excessive force claim.  (Dkt. No. 5).  Specifically, the court recognized that "directing or encouraging an attack against an inmate may give rise to a cognizable Eighth Amendment claim if the conduct places the inmate in physical danger."  (Dkt. No. 5 at 16) (collecting cases).  In this case, plaintiff has alleged both in his complaint and at his deposition that C.O. Cook made a specific threat to plaintiff describing how he would have other inmates harm plaintiff on his behalf.  (Compl. at 3; Pl.'s Depo. at 7).  Plaintiff has also alleged that he was warned by two other inmates not to go to the yard and/or the mess hall soon after C.O. Cook made the alleged threat, because they had knowledge that C.O. Cook had paid another inmate to attack plaintiff.  (Compl. at 3; Pl.'s Depo. at 6-11).  It is undisputed that plaintiff was involved in two physical altercations soon after these alleged conversations took place, which plaintiff avers were unsolicited attacks by other inmates with whom he had no history.

As to defendants' request the court grant summary judgment of this claim, they have failed to meet their burden of demonstrating the absence of any genuine issues of material fact as to whether C.O. Cook orchestrated assaults on plaintiff by other inmates, placing plaintiff in physical danger.  In support of their motion, defendants

have submitted the sworn declaration of C.O. Cook, which provides significant detail surrounding his use of force on December 5th, when he placed plaintiff in a "figure four leg lock body hold" to force compliance and end the altercation.  (Cook Decl. ¶¶ 5-10).  However, other than recognizing plaintiff's claim that he "orchestrated an excessive force incident upon" plaintiff, C.O. Cook does not refute or otherwise discuss plaintiff's allegations regarding specific threats made by him, or the allegation that he compensated another inmate or inmates to attack plaintiff.

In the defendants' memorandum of law, counsel argues that there are

> no specific facts that indicate any animosity between C.O. Cook and plaintiff . . . apart from very loosely tangential allegations plaintiff makes regarding an earlier instance with C.O. Cook. . . . However, plaintiff fails to prove a nexus between these alleged remarks and plaintiff's unrelated fight with another individual[.] . . . Plaintiff does not claim that [C.O.] Cook made a specific threat, and there was no alleged date of threat, just an alleged future threat of harm.

(Def.'s MOL at 16).  Plaintiff has, however, alleged specific facts detailing the growing animosity between himself and C.O. Cook, including names, dates, and specific verbal threats made.  (Compl. at 3-4).  The "nexus" between C.O. Cook's alleged remarks and plaintiff's fight with other individuals - the specific warnings plaintiff alleges to have received from two other inmates not to go to the yard and/or mess hall because of an anticipated attack – need not be "proven"[9] at this juncture, and is sufficient to raise a material question of fact in the absence of any contrary evidence by the defendants.

---

[9] Presumably, plaintiff could subpoena these inmates at trial in order to introduce evidence of the "nexus" described by defendants.

Even where, as here, a non-moving party fails to respond to a motion for summary judgment, a court "may not grant the motion without first examining the moving party's submissions to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.  If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied <u>even if no opposing evidentiary matter is presented</u>." *Vermont Teddy Bear Co.*, 373 F.3d 241 at 244 (emphasis in original). Because the defendants have failed to show the absence of a genuine issue as to whether C.O. Cook orchestrated an assault on plaintiff by other inmates, the court will not recommend summary judgment as to this claim.

## V.    <u>Failure to Prosecute</u>

### A.    **Legal Standards**

Rule 41(b) of the Federal Rules of Civil Procedure provides that a court may, in its discretion, dismiss an action based upon the failure of a plaintiff to prosecute the action, or comply with any order of the court.  *Reid v. Russell*, No. 9:18-CV-44 (BKS/DJS), 2020 WL 1250427, at *1 (N.D.N.Y. Feb. 12, 2020), *report recommendation adopted*, 2020 WL 1245405 (N.D.N.Y. Mar. 16, 2020) (citing *Link v. Wabash R.R. Co.*, 370 U.S. 626, 629 (1962)).  Moreover, notwithstanding the leniency with which pro se plaintiffs are treated, a plaintiff has the duty to inform the court of any address changes. "The demand that plaintiffs provide contact information is no esoteric rule of civil procedure, but rather the obvious minimal requirement for pursuing a lawsuit." *Allen v. Moreland*, No. 6:16-CV-6539, 2018 WL 3637467, at *1 (W.D.N.Y.

28

July 30, 2018) (emphasis added) (quoting *Dumpson v. Goord*, No. 00-CV-6039, 2004 WL 1638183, at *3 (W.D.N.Y. July 22, 2004)).  Additionally, Rule 41.2(b) of the Local Rules of Practice for the Northern District of New York states that failure to notify the court of a change of address in accordance with Local Rule 10.1(c)(2) may result in the dismissal of any pending action.

It is neither the court's function, nor the respondent's responsibility, to search for petitioner's possible location after his release.  See *Dansby v. Albany Cty. Corr. Facility*, No. 6:95-CV-1525 (RSP/RWS), 1996 WL 172699 at *1 (N.D.N.Y. Apr. 10, 1996) ("It is neither feasible nor legally required that the clerks of the district courts undertake independently to maintain current addresses on all parties to pending actions. It is incumbent upon litigants to inform the clerk of address changes, for it is manifest that communications between the clerk and the parties or their counsel will be conducted principally by mail.  In addition to keeping the clerk informed of any change of address, parties are obliged to make timely status inquiries.  Address changes normally would be reflected by those inquiries if made in writing.") (citations omitted)).

When assessing whether to dismiss a case for failure to prosecute, a district court should consider:

(1) the duration of the plaintiff's failure to comply with the court order,

(2) whether [the] plaintiff was on notice that failure to comply would result in dismissal,

(3) whether the defendants are likely to be prejudiced by further delay in the proceedings,

(4) a balancing of the court's interest in managing its docket with the plaintiff's interest in receiving a fair chance to be heard, and

(5) whether the judge has adequately considered a sanction less drastic than dismissal.

*Jefferson v. Webber*, 777 F. App'x 11, 14 (2d Cir. 2019) (quoting *Baptiste v. Sommers*, 768 F.3d 212, 216 (2d Cir. 2014)).  Dismissal is a harsh remedy to be utilized only in "extreme situations." *Lucas v. Miles*, 84 F.3d 532, 535 (2d Cir. 1996) (citing *Alvarez v. Simmons Market Research Bureau, Inc.*, 839 F.2d 930, 932 (2d Cir. 1988)). The Second Circuit has also "emphasized the importance of first giving a pro se litigant a direct warning that his case will be dismissed for failure to prosecute[.]" *Lowmack v. Napoli*, No. 1:07-CV-0200, 2011 WL 1560930 at *3 (W.D.N.Y. Apr. 5, 2011) (citing *Drake*, 375 F.3d at 251), *report-recommendation adopted,* 2011 WL 1560972 (W.D.N.Y. Apr. 25, 2011).

## B.   Analysis

The court has received no direct communication from plaintiff in over a year.  As previously noted, plaintiff was released from custody on December 29, 2022, and has not filed a change of address notification with the court in the five months since his release.  Plaintiff's failure to comply with the court's order and the Northern District of New York's Local Rules strongly indicate that he no longer wishes to pursue his lawsuit.  Local Rule 41.2(a) provides that "the plaintiff's failure to take action for four (4) months shall be presumptive evidence of lack of prosecution."  In Judge Hurd's initial order evaluating plaintiff's complaint pursuant to § 1915, plaintiff received

30

adequate notice that the failure to provide the court with a current address could result in dismissal of his action.  (Dkt. No. 5 at 29).

Mail sent to plaintiff since his release from custody, including multiple papers related to the instant summary judgment motion, has been returned as undeliverable. (Dkt. No. 18, 19).  As noted above, the unresponsiveness of plaintiff impedes the court's ability to schedule and conduct future proceedings in this action, which could include an exhaustion hearing requiring the presence of multiple witnesses.  The inability to communicate with plaintiff at this juncture clearly prejudices defendants' ability to continue with the defense of this case, as any further delay of adjudicating plaintiff's action may well affect witnesses' memories, the ability to locate witnesses, and the preservation of evidence. *Reid v. Russell*, 2020 WL 1250427, at *2.  Under the circumstances, the need to alleviate congestion on the Court's docket outweighs plaintiff's right to a further, indefinite period of time within which to re-establish contact with the court and to be heard in this case.

Any further attempts to serve plaintiff with case-related materials at his address of record would be futile, since it is clear he has been released from state prison.  Unless the plaintiff promptly resumes contact with the court, there would be no lesser sanctions that this court could consider.  *See Gervasio v. Diaz,* No. 9:20-CV-346 (TJM/DJS), 2022 WL 3701718, at *2 (N.D.N.Y. May 12, 2022), *report and recommendation adopted*, 2022 WL 3701573 (N.D.N.Y. Aug. 26, 2022)  ("Without the meaningful ability to communicate with Plaintiff, however, there is no way to procure his 'reappearance' to actively prosecute this action.  Moreover, simply waiting for him to

31

comply with his obligations has not been and is not likely to be fruitful, since he has failed to do so for some months now."). In consideration of the above factors, dismissal pursuant to Fed. R. Civ. P. 41(b) would be appropriate. *See Gaines v. Bezio*, No. 9:09-CV-176 (GTS/DEP), 2009 WL 2252140 at *2-3 (N.D.N.Y. Jul. 28, 2009) (dismissing action for failure to comply with Fed. R. Civ. P. 41(b) and then Local Rule 41.2(b) where plaintiff was released from prison in March 2009 and failed to comply with court's order by filing an amended complaint and by providing a current address); *Wilson v. Perlman*, No. 9:07-CV-1128 (TJM/DEP), 2009 WL 1851336 at *2-3 (N.D.N.Y. Jun. 26, 2009) (action dismissed pursuant to Fed. R. Civ. P. 41(b) where plaintiff was released from prison in March 2009 and "failed to provide the court a current address where he can be reached for purposes of communications from the court.").[10]

Nevertheless, in an abundance of caution, this court has exceeded the requirements of applicable law by tracking down plaintiff's parole officer and obtaining plaintiff's last reported address since his release. The court will direct the Clerk of the Court to serve this Report-Recommendation on plaintiff at that address and provide him with an extended period of thirty (30) days to advise the court in writing of (1) his

---

[10] The court is mindful of the recent decision in *Mayanduenas v. Bigelow*, 849 F. App'x 308 (2d Cir. 2021), where the Second Circuit concluded that the facts of that case were not sufficiently extreme to merit dismissal with prejudice. However, many facts which the court considered in that case, including Mayanduenas's homelessness, mental health struggles, and limited language proficiency, have not been raised in the instant case. *Id.* at 311. Moreover, in *Mayanduenas* the district court dismissed the case for failure to prosecute before the deadline to amend pleadings and conclude discovery had passed under the operative scheduling order. Here, the deadlines for discovery and dispositive motions expired months ago.

confirmed, current contact information; (2) any circumstances justifying his failure to advise the court of his accurate contact information for the past five months; and (3) his intentions with respect to continuing to participate in this litigation, to the extent permitted by the court.  District Judge David N. Hurd will ultimately issue a final ruling with respect to the pending summary judgment motion and determine to what extent the proceedings in this case will continue, and which particular claim(s) survive summary judgment.  This court will also extend to thirty (30) days the time period for the plaintiff to file written objections with the district court regarding this Report-Recommendation.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the Clerk promptly serve a copy of this Order and Report-Recommendation, along with a copy of the entire docket entries from this case, on plaintiff, C/O 1075 Wendell Avenue, 1st Floor, Schenectady, New York 12308.  And it is

**ORDERED**, that, within thirty (30) days of this order, plaintiff shall advise the court, in writing, of his current contact information and his intentions with respect to continuing to participate in this litigation, to the extent permitted by the court. **Plaintiff's continuing failure to provide his current contact information to the court, or to otherwise obey the orders and directives of the court will likely result in the termination of this action, with prejudice.**  And, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No.

33

15) be **GRANTED** as to plaintiff's Eighth Amendment excessive force claim against defendant Wells, and the complaint be **DISMISSED WITH PREJUDICE** as against defendant Wells, and it is

     **RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 15) be **GRANTED** as to plaintiff's Eighth Amendment excessive force claim against defendant Cook for his specific application of force on plaintiff during the December 5, 2021 altercation at the Clinton C.F. mess hall, and it is

     **RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 15) be **DENIED** as to plaintiff's Eighth Amendment excessive force claim against defendant Cook for allegedly orchestrating the December 5, 2021, and/or December 20, 2021 assaults on plaintiff by other inmates, subject to the outcome of an exhaustion hearing to determine whether plaintiff exhausted his administrative remedies or whether the inmate grievance process was available to plaintiff, and it is

     **RECOMMENDED,** that, notwithstanding the foregoing, the complaint be **DISMISSED IN ITS ENTIRETY,** sua sponte, for failure to prosecute and/or comply with the orders and Local Rules of the court pursuant to Fed. R. Civ. P. 41(b), unless plaintiff submits, with any objections, updated contact information and a statement of justification that the court finds adequate to excuse plaintiff's failure to update the court with respect to his contact information over the past five months.

     Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have an extended time period of thirty (30) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE**

**TO OBJECT TO THIS REPORT WITHIN THIRTY DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Hum. Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated:  June 5, 2023

Andrew T. Baxter
U.S. Magistrate Judge